UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————

16-2598

———————————

United States of America,

Appellee,

v.

Veltrez Black,

Appellant.

On Appeal from the United States District Court
for the District of Minnesota
The Honorable Richard H. Kyle (Dist. Ct. No. 14-CR-364-RHK-FLN)

**BRIEF OF APPELLANT**

Dorsey & Whitney LLP
RJ Zayed (#0309849)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 340-2600

Jones Day
Kristin K. Zinsmaster (#0391299)
90 South Seventh Street, Suite 5090
Minneapolis, MN 55402
(612) 607-7950

*Attorneys for Appellant*

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

The district court erred when it denied Defendant Veltrez Black's ("Black") motion for a mistrial based upon the admission of irrelevant and highly prejudicial evidence related to murders, assaults, and shootings. Prior to and during trial, Black moved for the exclusion of this evidence under Rules of Evidence 402 and 403. These requests were denied, resulting in the jury hearing testimony and argument related to a violent gang war that did not implicate Black in any way and was not necessary to prove any element of the charged offenses.

The district court further erred when it denied Black's motions for judgment of acquittal and for dismissal for two reasons. First, the evidence presented at trial was not sufficient to convict Black of unlawful possession of a firearm on April 22, 2014, or of being a member of the charged conspiracy. Second, Black's indictment on the felon-in-possession count was based upon false testimony presented to the Grand Jury by an ATF case agent.

Lastly, the district court erred when it sentenced Black to 180 months in prison. This sentence is at least three times that of most of Black's co-defendants, who pleaded guilty. It creates an unwarranted sentencing disparity and is greater than necessary to achieve the aims set forth in 18 U.S.C. § 3553(a).

Black respectfully requests fifteen minutes for oral argument.

# TABLE OF CONTENTS

**Page**

SUMMARY AND REQUEST FOR ORAL ARGUMENT.......................................i

TABLE OF CONTENTS......................................................................... ii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE, PROCEDURAL HISTORY, AND FACTS ..........3

I.      Procedural History .........................................................................5

II.     Background Facts ...........................................................................7

        A.      Black's Personal Background .................................................7

        B.      The Conspiracy Charge and its "Context" .............................8

        C.      The Separate Felon-in-Possession Charge ..........................13

        D.      Conviction and Sentencing.................................................17

SUMMARY OF THE ARGUMENT .....................................................17

ARGUMENT ...................................................................................18

I.      The Cumulative Effect of Improperly Prejudicial Information
        Presented as "Context" for the Conspiracy Charge Deprived Black of
        a Fair Trial. ................................................................................18

        A.      The District Court Erred in Admitting Irrelevant and Unduly
                Prejudicial Evidence of Murders and Shootings.................19

                1.      Relation to the Charged Offense and Prejudicial Effect..........20

                2.      Cumulative Effect ...............................................22

        B.      Officer Tuma's Testimony Compounded the Unfairness. ..................25

        C.      Other Facts Operated To Make a Fair Trial an Impossibility. ............27

II.     The Evidence at Trial Was Insufficient to Support Black's Conviction on the Possession Count. .................................................................29

      A.     No Reasonable Interpretation of the Evidence Presented at Trial Supports a Conviction Beyond a Reasonable Doubt. .........................30

            1.     Actual Possession.....................................................................31

            2.     Constructive Possession............................................................33

III.    The Evidence Was Similarly Insufficient for the Jury To Convict Black of Conspiracy. ......................................................................40

IV.     The Case Agent Presented False Testimony to the Grand Jury that Substantially Influenced the Grand Jury's Decision To Indict on the Possession Count and the District Court Erred in Failing To Dismiss as a Result of that False Testimony. ...............................................42

V.      Black's Sentence of 180 Months is Disproportional and Greater than Necessary To Achieve the Aims of 18 U.S.C. § 3553(a)...............................44

      A.     The District Court Committed Procedural Error in Sentencing Black to 180 Months in Prison. ..........................................................44

CONCLUSION ...............................................................................................50

CERTIFICATE OF COMPLIANCE........................................................................52

CERTIFICATE OF VIRUS PROTECTION ...........................................................53

CERTIFICATE OF SERVICE ..............................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)..................................................................2, 42

*Gall v. United States*,
    552 U.S. 38 (2007)..........................................................................44

*United States v. Arrington*,
    215 F.3d 855 (8th Cir. 2000) ..........................................................34

*United States v. Bailey*,
    831 F.3d 1035 (8th Cir. 2016) .................................34, 37, 38, 39

*United States v. Battle*,
    774 F.3d 504 (8th Cir. 2014) ....................................................31, 35

*United States v. Chatmon*,
    742 F.3d 350 (8th Cir. 2014) ..........................................................30

*United States v. Conrad*,
    320 F.3d 851 (8th Cir. 2003) ...................................................*passim*

*United States v. Crumley*,
    528 F.3d 1053 (8th Cir. 2008) ...................................................45, 46

*United States v. Cruz*,
    285 F.3d 692 (8th Cir. 2002) ..........................................................29

*United States v. Dunlap*,
    28 F.3d 823 (8th Cir. 1994) ............................................................31

*United States v. Evans*,
    431 F.3d 342 (8th Cir. 2005) ....................................................30, 35

*United States v. Garrett*,
    648 F.3d 618 (8th Cir. 2011) ..........................................................34

*United States v. Grubbs*,
    506 F.3d 434 (6th Cir. 2007) ..........................................................33

*United States v. Johnson*,
  18 F.3d 641 (8th Cir. 1994) ...............................................................35

*United States v. Kouba*,
  822 F.2d 768 (8th Cir. 1987) .............................................................43

*United States v. Lazenby*,
  439 F.3d 928 (8th Cir. 2006) ...................................................2, 45, 46

*United States v. Light*,
  406 F.3d 995 (8th Cir. 2005) ........................................................34, 38

*United States v. Madkins*,
  994 F.2d 540 (8th Cir. 1993) ...........................................................2, 36

*United States v. McKay*,
  431 F.3d 1085 (8th Cir. 2005) .........................................................2, 26

*United States v. Noe*,
  411 F.3d 878 (8th Cir 2005) ..............................................................18

*United States v. Pace*,
  922 F.2d 451 (8th Cir. 1990) .............................................................29

*United States v. Peoples*,
  250 F.3d 630 (8th Cir. 2001) .............................................................18

*United States v. Roark*,
  924 F.2d 1426 (8th Cir. 1991) ........................................................2, 27

*United States v. Rodriguez*,
  414 F.3d 837 (8th Cir. 2005) .............................................................42

*United States v. Rolon-Ramos*,
  502 F.3d 750 (8th Cir. 2007) .............................................................41

*United States v. Shepard*,
  413 F. App'x 931 (8th Cir. 2011) ......................................................45

*United States v. Thibeaux*,
  784 F.3d 1221 (8th Cir. 2015) ...........................................................37

*United States v. Varner*,
  678 F.3d 653 (8th Cir. 2012) ...............................................................34

## Statutes

18 U.S.C. § 371 ........................................................................1, 3, 5, 21

18 U.S.C. § 922 ......................................................................1, 3, 5, 20

18 U.S.C. § 924 ..................................................................................3, 5

18 U.S.C. § 1344 ....................................................................................1

18 U.S.C. § 1349 ....................................................................................1

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 3553(a) ......................................................................*passim*

28 U.S.C. § 1291 ....................................................................................1

## Other Authorities

Fed. R. Crim. P. 29 .................................................................................6

Fed. R. Evid. 402 .................................................................................19

Fed. R. Evid. 403 .................................................................................19

# JURISDICTIONAL STATEMENT

Black was convicted of Conspiracy-Felon in Possession of Firearms (18 U.S.C. § 371) and Felon in Possession of a Firearm (18 U.S.C. § 922). Jurisdiction in the district court was based on 18 U.S.C. §§ 371 and 922 and 18 U.S.C. § 3231. The district court entered Final Judgment on May 27, 2016. Black timely filed a Notice of Appeal on June 3, 2016. This Court accordingly has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1.     Whether the district court erred when it denied Black's motion for mistrial, after the Government presented to the jury unduly prejudicial and irrelevant evidence of murders, assaults, and shootings that did not implicate Black in any way, nor otherwise connect him to any of those crimes or to the offenses charged.

- *United States v. Conrad*, 320 F.3d 851, 853 (8th Cir. 2003)

- *United States v. McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005)

- *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991)

2.     Whether the evidence adduced at trial was insufficient to prove that Black unlawfully possessed a firearm on April 22, 2014, and was a member of a conspiracy.

- *United States v. Madkins*, 994 F.2d 540, 542 (8th Cir. 1993)

3.     Whether the district court erred when it declined to dismiss the gun possession count, where the evidence at trial showed that the ATF case agent presented false testimony to the Grand Jury that substantially influenced the Grand Jury to return an indictment.

- *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)

4.     Whether the district court erred when it sentenced Black to 180 months' incarceration, a sentence at least three times longer than most similarly situated co-defendants.

- *United States v. Lazenby*, 439 F.3d 928, 932 (8th Cir. 2006)

# STATEMENT OF THE CASE, PROCEDURAL HISTORY, AND FACTS

Defendant Veltrez Black ("Black") was convicted of Count 1, Conspiracy to possess firearms unlawfully in violation of 18 U.S.C.§ 371 ("Conspiracy Count") and Count 2, Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g) and 924 ("Possession Count"). Because the court erred in admitting unduly prejudicial and irrelevant evidence, and in denying Black's motions for judgment of acquittal and motion to dismiss the Indictment, this Court should reverse both convictions.

To secure both convictions, the Government (over Black's objections) presented unduly prejudicial and irrelevant evidence and argument related to an ongoing gang war that included "shooting deaths" and "gunshot woundings." It did this despite the fact that Black was neither implicated in, nor otherwise connected to, any of these crimes. Indeed, most of these crimes were unsolved at the time of trial and most of them occurred at times when Black was incarcerated. The Government presented this evidence and argument to the jury at every opportunity, denying Black his right to a fair trial.

The relevant evidence the Government did present during its case-in-chief was insufficient to support either conviction. As to the Possession Count, the evidence adduced at trial proved only that Black was a passenger in a vehicle driven by an individual with a felony conviction. The driver of this vehicle fled

from police.  When officers pulled the vehicle over and retraced its approximate path, they located a firearm on the ground.  Neither Black's fingerprints nor his DNA were found on that firearm, and no witness could testify as to how the gun got to the location at which it was recovered by police.

The evidence adduced at trial in support of the Conspiracy Count is similarly insufficient.  Not a single witness—including self-admitted gang members cooperating with the Government—testified that Black agreed with them or with others to unlawfully possess firearms.  The Government was forced to rely upon unauthenticated Internet postings featuring Black flaunting money or otherwise goofing around at gatherings with family and friends in order to prove its conspiracy charge.  In doing so, it proved only mere presence.

Each of these errors came at great cost to Black, a young man who was sent to prison for 180 months, the maximum available under the applicable statutes.  This sentence was disproportionately longer than any of Black's ten co-defendants.  The longest sentence that any of the other individuals received was 130 months (Dist. Ct. Dkt. No. 792)[1]—and that for a man who not only pleaded guilty to the conspiracy but also was separately tried and convicted of witness tampering.  Other similarly situated co-defendants received sentences of 46, 52, 57, 60, 78, and 84

---

[1]  Here forward, all references to "Dkt. No." refer to the docket in D. Minn. Case No. 14-CR-364 (RHK/FLN).

months, respectively.[2]  Black's 180-month consecutive sentence amounts to an inappropriate trial penalty and runs afoul of the statute setting forth the goals of criminal sentencing.  *See* 18 U.S.C. § 3553(a).

Both Black's convictions and his sentence are unsupported by law or by fact. Accordingly, this Court should reverse the judgment of the district court.

## I.    Procedural History

Black was charged with Conspiracy and Unlawful Possession of a Firearm pursuant to 18 U.S.C. §§ 371, 922(g), and 924, along with ten other individuals, on November 12, 2014.  (Appendix to Brief of Appellent ("Aplt. App'x") 1.)  A Superseding Indictment was filed in this matter on May 20, 2015, adding reference to two additional overt acts in furtherance of the conspiracy (as to Black).  (Aplt. App'x 34.)

Black was taken into custody on November 19, 2014, and has remained incarcerated since that time.  Black moved to strike surplusage (highly prejudicial and factually irrelevant allegations concerning a violent gang war including homicides, assaults, and other conduct not charged against Black) from the Superseding Indictment on July 8, 2015.  (Dkt. No. 386.)  That motion was denied by the magistrate judge and that ruling was in turn upheld by the district court. (Addendum to Brief of Appellant ("Aplt. Add.") 1, 12.)  Black moved *in limine* to

---

[2]    *See* Dkt. Nos. 652, 656, 666, 711, 718, 752, 780.

exclude the irrelevant, inflammatory, and unduly prejudicial evidence of the six

murders, the seven shootings, and the testimony of the Government's gang expert.

(Dkt. Nos. 473, 518). The court denied all of these motions, except the portion that

requested that the gang expert be precluded from opining that Black was a member

of the 1-9 or SUB gangs, without analysis. (Aplt. Add. 14.) Black was the sole

defendant to take his case to trial before a jury.

Black moved for a mistrial at the close of the Government's case-in-chief

and again at the close of its rebuttal case because of the irrelevant, inflammatory,

and unduly prejudicial evidence that the court allowed to be presented to the jury,

which had nothing to do with Black. (Aplt. App'x 288, 330-31.) The court

denied Black's motions without analysis. Black moved for judgment of acquittal

on both Counts 1 and 2 at the close of the Government's case-in-chief pursuant to

Federal Rules of Criminal Procedure 29, which the court also cursorily denied.

(Aplt. App'x 287, 331.) Black also moved to dismiss the Possession Count on the

basis that the ATF case agent testified falsely before the Grand Jury with respect to

the sole evidence presented as to the Possession Count. (Aplt. App'x 284-86.)

The court denied the motion, again with no analysis. (*Id.*)

The jury convicted Black of both charged offenses on October 22, 2015.

On November 5, 2015, Black renewed his motion for judgment of acquittal in

writing. (Dkt. No. 564.) The district court summarily denied the renewed motion

on December 18, 2015. (Aplt. Add. 16.) After moving for both a downward departure and a variance, Black was sentenced on May 27, 2016, to imprisonment for 120 and 60 months, to be served consecutively. Judgment of sentencing was entered on May 31, 2016. (Dkt. Nos. 705-707, 726; Aplt. Add. 18.) Black timely noticed his appeal of both his conviction and his sentence on June 3, 2016. (Dkt. No. 741.)

## II. Background Facts

### A. Black's Personal Background

Black was born in Minnesota in 1988. He has lived his entire life in North Minneapolis—part of the city unfortunately synonymous with economic blight and urban crime. (*See* Aplt. App'x 291, 299.) The neighborhoods of North Minneapolis comprise a relatively small geographic area. Its residents testified to strong familial and community ties, often borne of necessity in the face of poverty and crime. (*E.g.*, Aplt. App'x 290, 294-95, 297.)

Black was born into a loving family that supported him. He lived often with his mother and sometimes with his grandparents at 14th and Russell Avenue. (Tr. 292-93.) His mother, who testified at trial, is employed as a transit operator with Metro Transit and raised him and her other children as a single parent. (Aplt. App'x 290.)

Black's family included a half-brother Tyrone Washington, also known as "Ty Crack." As emphasized at trial, and not disputed by Black, prior to his death in 2012 (which is discussed in more detail below), Washington was the widely-recognized leader of a North Minneapolis street gang known as the 1-9. (Aplt. App'x 52-53, 221.) The 1-9 is by all accounts closely aligned with another gang known as the Stick Up Boys, or "SUB" and, together, these groups proclaim themselves to be in opposition to two other North Minneapolis gangs: the Taliban and the Young-n-Thuggin', or "YNT." (*E.g.*, Aplt. App'x 118-19, 120.) The 1-9 and SUB gangs are the subjects of the Superseding Indictment and were discussed at length during Black's trial.

## B. The Conspiracy Charge and its "Context"

In its Superseding Indictment, the Government charged eleven individuals with conspiracy to unlawfully possess firearms. Ten of these individuals, none of whom testified at trial, pleaded guilty to either this charge or a separate charge of gun possession.

In the Conspiracy Count, the Government alleged that Black entered into an agreement with 1-9 and SUB gang members to unlawfully possess firearms and that he committed three overt acts in furtherance of that agreement. Specifically, it said, he unlawfully possessed seven firearms at a residence on Girard Avenue North in Minneapolis on December 12, 2013; he unlawfully possessed two

firearms during a traffic stop on August 2, 2010; and he unlawfully possessed one firearm during a traffic stop on December 17, 2011. (Aplt. App'x 38-39, ¶¶ 12, 17, 20.)

It bears noting that Black did plead guilty in state court to two of these overt acts prior to the Indictment in this case: the December 12, 2013, and the December 17, 2011, incidences. Black accepted responsibility for possession of a firearm on December 17, 2011, because, in his own words, he was around his brother in North Minneapolis; his brother had a lot of enemies; and Black needed to protect himself. (Aplt. App'x 320-21.) Later, Black admitted he possessed one of the guns in the home on Girard Avenue North on December 12, 2013. When testifying as to his reason for doing so, Black used stark terms: "Q. . . . Why were you carrying a gun? A. For my protection. I was going to a party. . . . Around my brother['s] friends, Leaf['s] friends, which is 1-9, and I had to protect myself as my brother already being killed, there was a lot going on. I brought my gun. Q. Were you afraid that you would be killed? A. Shot, killed, something." (Aplt. App'x 322.) When describing the incidences of gun possession to which he pleaded guilty, Black testified that he did not possess the firearms as part of an agreement with anyone present, anyone on the Indictment, or anyone at all. (Aplt. App'x 315-16, 320-21, 323.)

Behind these unconnected instances of possession, suggested the Government, was a broader backdrop. Black's brother, Tyrone Washington, was the leader of the 1-9. On November 3, 2013, he was shot and killed at a nightclub in Minneapolis. The Government insinuated at trial that the mantle was then passed to Washington's little brother, Black, who goes by the nickname "Chief."[3] This set the stage for the manner in which the Government would attempt to prove up the "agreement" element of its conspiracy—through Black's supposed affiliation with the 1-9 and SUB gangs.

The Government's own witnesses, however, testified that Black was not known to either members or rivals as a 1-9 or SUB gang member. Bridget Turntine, the renter of the residence on Girard Avenue North used by a 1-9 gang leader known as "Cash," testified that she was not sure whether Black was 1-9 and she thought he was "something else." (Aplt. App'x 65-66.) Antonio Lewis, an SUB member with a gang roster tattooed on his arm, testified that he did not know whether Black was a member of the 1-9 and that he was certain Black was not a member of the SUB. (Aplt. App'x 124-28.) Kibbie Walker, a prominent Taliban

---

[3]     Regarding the "Chief" moniker, Black's mother testified that she gave her son the nickname "Chief" on the day he was born. (Aplt. App'x 291-92.) Moreover, prior to trial, the Government admitted that it did not have witnesses who could testify that Black was in fact any sort of leader in any gang and agreed to redact that language from the Superseding Indictment. (Aplt. App'x 50.)

member, enemy to the 1-9 and SUB gangs, and in fact suspected to have murdered Black's brother, testified that Black was not his enemy, that he had never had any occasion to "bump heads" with him, and he was not "gunning" for him. That makes him, Walker said, "collateral damage."[4] (Aplt. App'x 138, 146.)

To shore up its theory of "agreement" (and guilt by association) in the face of this contradictory evidence, the Government relied upon the testimony of its gang expert, Minneapolis police officer Jaclyn Tuma. But Officer Tuma had not herself ever worked on the streets of North Minneapolis. Instead, she had an "intel" position, poring through "data" on the criminal element. (Aplt. App'x 239-242.) She testified, over Black's objections and based upon her review of hearsay (and double hearsay) contained in police reports and unauthenticated Facebook and Instagram postings, that Black met seven of nine criteria for gang membership under Minnesota law. (*See* Aplt. App'x 212-13, 238.) She also testified regarding specific murders and shootings and "gang life" in general—at one point attempting to define the phrase "Hood Ni**a'" as, "basically . . . an African American male who lives in a poor area and who participates in activities that are [] associated with that area. Basically gang members." (Aplt. App'x 223, *see also id.* at 226,

---

[4]    Defense witnesses confirmed this testimony, averring that they did not know Black to claim membership in or affiliation with his brother's 1-9 gang. (*E.g.*, Aplt. App'x 295-96, 298, 300, 318.)

231, 235.)  She admitted that there may be "some slight differences from different

sources" as to her proposed definition.  (Aplt. App'x  223.)

A great deal of Officer Tuma's "intel" was based upon her review of

Facebook and Instagram.  She testified that she reviewed photos and comments on

these websites, some of which were entered as exhibits and none of which were

properly authenticated at trial.  (*E.g.*, Aplt. App'x 162-209, (testimony of ATF

Agent Singer); 210-270 (testimony of Officer Tuma).)[5]  These exhibits depicted

Black in the mere presence of alleged gang members (often family members or his

brother's friends); rap lyrics; clothing with words and symbols that Officer Tuma

felt were associated with gangs; and youthful misbehavior.  (Aplt. App'x 226-27,

229, 231-32, 235, 237; *see also* Aplt. App'x 327-44 (Trial Ex. 102), 345-53 (Trial

Ex. 102A).)  Officer Tuma admitted as much on cross-examination.  (Aplt. App'x

237-70.)  An ATF agent charged with "pulling" photographs from the same

Internet sites testified in addition that, "[i]n all of [her] pulls from Facebook and

Instagram" she "never saw a picture of [Black] with a gun."  (Aplt. App'x 197.)

---

[5]  Many of the photographs that Agent Singer pulled from Black's social media
accounts were posted when Black was incarcerated.  (*See* Aplt. App'x 202-03.)
Many were undated and bore no further indicia of who posted them, where, or
when.  (*See, e.g.*, Aplt. App'x 327-53 (and all subparts).)  Over Black's
objections (Aplt. App'x 157) however, virtually all social media photos
proffered by the Government at trial were admitted.

Of course, Black was not charged with a federal crime of "gang membership" (which does not exist).  Gang affiliation served as the driving force of the Government's theory of guilt on the conspiracy charge.  But, the evidence it relied upon had nothing to do with affiliation.  Instead, one of the first documents shown to the jury during opening statements was a demonstrative—a timeline of murdered and wounded gang members going back to 2009.  (*See* Aplt. App'x 54-61.)  Despite defense counsel's repeated efforts to exclude such references,[6] the Government elicited testimony throughout trial pertaining to six murders and seven additional instances of gun violence directed at persons or homes.  With respect to each of these events, Black was not implicated or connected to them in any way—whether by witness accounts, fingerprint evidence, ballistics, or trace DNA.  And in fact, as defense counsel pointed out at trial, he was incarcerated at the time of at least six of the events.

### C.  The Separate Felon-in-Possession Charge

The Government also argued to the jury that Black was guilty of unlawfully possessing a particular firearm.  This charge stemmed from events that took place on April 22, 2014.  Three law enforcement officers, one ATF agent, and two lay witnesses testified to the following facts:  On April 22, 2014, the Hennepin County

---

[6]   These efforts began with a motion to strike as surplusage such references in the Superseding Indictment and an omnibus motion *in limine* and continued throughout trial.  (*E.g.*, Dkt. Nos. 386, 473.)

Sheriff's Department (by and through Detective Andrew Suerth) decided to serve an arrest warrant upon Black for a supposed probation violation. (Aplt. App'x 70-71.) The warrant was quashed before the arrest, but officers testified that they believed it to be in place at the time that they moved in. (*E.g.*, Aplt. App'x 77-78.) Through surveillance of Black's car, Officers came to the conclusion that Black was located in the area of an apartment complex in a northern suburb of Minneapolis, and went there to arrest him. (Aplt. App'x 71-72.) Black's state-court lawyer called Black while he was at the apartment complex to apprise him of the fact that officers were actively looking to arrest him. (Aplt. App'x 326.) Detective Suerth thereafter spotted Black entering the passenger side of a vehicle with a known felon, Black's cousin Omar Rush. (Aplt. App'x 73.) Black did not own this vehicle. (Aplt. App'x 78.) With both Rush and Black in the vehicle (Rush as driver, Black as passenger), two other police officers, Johnson and Hjelm, attempted a traffic stop by activating the lights and sirens on their unmarked car. At first, Rush made motions to pull over and comply with police, but in the next second he changed his mind and led officers on a short chase through the parking lot. As Rush's vehicle proceeded at a high rate of speed through the parking lot, it eventually reached a bank of garage doors and had to make a sharp left turn, striking a vehicle in the process. (Aplt. App'x 79-81.) Both the owner of this vehicle and another witness testified at trial. (Aplt. App'x 102-13.) Rush

proceeded a short distance farther, eventually pulling over.  Officers Johnson and

Hjelm completed a high-risk stop and arrested both Rush and Black.  (Aplt. App'x

81.)   Other law enforcement officials later retraced the approximate route of the

chase and located a firearm on the ground near the garage doors referenced above.

(Aplt. App'x 81-82.)  No police officer or eyewitness saw how the gun arrived at

this location and neither the dash cam (Aplt. App'x 335 (and incorporated media))

nor the pole cam video (Aplt. App'x 336 (and incorporated media)) show anything

being discarded from the vehicle.  (*See also* Aplt. App'x 279-81.)  The

maintenance man and the individual whose truck was hit testified that, although

they watched the chase or its aftermath transpire, they did not see anyone in the car

throw or discard the weapon.  (Aplt. App'x 93-94, 108.)  Nor did either of them

notice the firearm that was laying on the ground in their vicinity near the garage

doors.  (Aplt. App'x 93-94, 108, 112.)  Officer Johnson and Officer Hjelm both

testified that they did not see anything being dropped or thrown out of the car, let

alone a firearm, and their contemporaneous police reports contained nothing to that

effect.  (Aplt. App'x 29, 99-100.)

Fingerprint and DNA analysis revealed neither Black's fingerprints nor any

trace of his DNA on the weapon.  (Aplt. App'x 116-17.)  In the earlier federal trial

of a different individual, Detective Suerth took the stand and testified that in

relation to this incident, Black was not charged with possession of the weapon in

state court because the gun was not "in his possession."  Detective Suerth

confirmed his prior testimony  on cross-examination. (Aplt. App'x 74-77.)

When presenting the sole evidence underlying the Possession Count to the

Grand Jury in this matter, an ATF Special Agent (the "Case Agent") testified

falsely.  He told the Grand Jury under oath that, to secure the Indictment on the

Possession Count, a police officer at the scene witnessed Black open the door to

the car driven by Rush and drop the firearm out of the vehicle:

> Mr. Black had a warrant for his arrest.  The Brooklyn Park Police
> Department was looking for him.  They knew him to have a warrant
> for his arrest.  They found him in a motor vehicle in an apartment
> complex.  They went to, to stop him, there was a short chase.  **The
> passenger of the car, which was Veltrez Black, during the chase
> opened the passenger door just a little bit, threw something out.**
> They eventually stopped, arrested Veltrez Black who was the
> passenger.  They went back to the stop where he opened the door and
> that's where this Smith & Wesson .40 caliber handgun was.

(Aplt. App'x 18.)

The Case Agent admitted at trial that this was not, in fact, what the evidence

showed.  The dash camera did not show it; the pole camera did not show it; and not

one of the three officers and two lay witnesses at the scene testified that they saw a

firearm being discarded.  The officers' police reports also did not contain any

reference to a firearm being dropped or thrown, and the DNA and fingerprint tests

came back negative for Black.  (Aplt. App'x 276-83.)

## D.    Conviction and Sentencing

Confronted with the unduly prejudicial and irrelevant evidence of six murders, seven shootings, and a violent gang war, the jury convicted Black of conspiracy and of possession of a firearm on April 22, 2014.  The district court sentenced Black to 180 months (Aplt. Add. 18), a sentence at least three times as long as six of his co-defendants and 50 months longer than a co-defendant convicted of witness tampering on top of the conspiracy charge.  Black argued that any term of imprisonment of more than 96 months was greater than necessary to achieve the goals set forth in 18 U.S.C. § 3553(a).  (Dkt. No. 707.)

## SUMMARY OF THE ARGUMENT

The district court erred when it denied Black's motion for a mistrial (as well as his many motions to exclude).  The evidence presented throughout trial of murders and shootings was irrelevant, inflammatory, inflammatory, and unduly prejudicial.  Cumulatively, it operated to deny Black his right to a fair trial.

The district court also erred when it denied Black's motion for judgment of acquittal on Counts 1 and 2, because the evidence put forth at trial was not sufficient for a reasonable jury to convict Black of conspiracy or of possessing the gun found in the path of the police chase on April 22, 2014.

Further, the district court erred when it declined to grant Black's motion for dismissal of the Possession Count based upon the false testimony that was

presented to the Grand Jury which substantially influenced the Grand Jury to indict on this charge.

Finally, a sentence of 180 months is disproportionate to the much shorter sentences received by Black's similarly situated co-defendants. Although nine of these ten individuals did not take their cases to trial, a sentence two to three times greater is not an appropriate "penalty" for exercising one's constitutional right to a jury trial. Moreover, the sentence is greater than necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## ARGUMENT

## I. The Cumulative Effect of Improperly Prejudicial Information Presented as "Context" for the Conspiracy Charge Deprived Black of a Fair Trial.

Twice at trial, Black moved for a mistrial upon the admission of the irrelevant, inflammatory, and unduly prejudicial evidence and other information that is the subject of this appeal. (Aplt. App'x 288, 330-31.) The cumulative effect of this material was to render Black's trial fundamentally unfair. This Court reviews a district court's denial of such a motion for abuse of discretion. *United States v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001).[7]

---

[7] At the root of the motion for mistrial were numerous motions to exclude the evidence summarized below. The standard of review for a district court's denial of a motion to exclude is the same—abuse of discretion. *United States v. Noe*, 411 F.3d 878, 887 (8th Cir 2005).

**A.    The District Court Erred in Admitting Irrelevant and Unduly Prejudicial Evidence of Murders and Shootings.**

At various times throughout the trial, over Black's objections, information related to murders, shootings, and a violent gang war was presented to the jury. This presentation came in the form of prosecutorial statements during opening and closing arguments, witness testimony, demonstratives, and exhibits. The Government's proffered reason for this material was that it was relevant to place the conspiracy in context. (Aplt. App'x 54.)

Because this material was irrelevant to the conspiracy charge, and because any "probative value [wa]s substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury," the Court should have excluded it in the first instance and should have granted Black's motion for a mistrial when it was elicited. *See* Fed. R. Evid. 402, 403.

Gun possession trials are vulnerable to becoming trials, not about possession, but about what a gun—any gun—can do to harm people or the community. The court recognized this fact when it reversed the defendant's conviction in *United States v. Conrad*, 320 F.3d 851, 853 (8th Cir. 2003). In *Conrad*, an individual was charged with unlawful possession of a sawed-off shotgun. He claimed the shotgun belonged to a housemate and went to trial, where the prosecutor repeatedly referenced certain prejudicial characteristics of the sawed-off shotgun that had nothing to do with Conrad's alleged possession of it.

*Id.* at 854. For example, the prosecutor referred to the ease with which a sawed-off shotgun can be concealed and at one point stated that "[i]t could put a pattern about this [indicating] big from nine feet away," presumably referring to a hypothetical shooting victim. *Id.* at 854-55 (brackets in original).

The court applied a two-part test to determine whether "the prosecutor's remarks unduly prejudiced the defendant's opportunity for a fair trial." *Id.* at 855. It held first that the statements were improper, because they did not relate to an element of the offense, did not aid the fact-finder, and their prejudicial effect substantially outweighed their probative value. *Id.* Second, the court examined the cumulative effect of the statements, which were "not limited to one phase of the trial." *Id.* The statements were repeated and reinforced with witness testimony. Any standard curative instructions (including the admonition that "lawyers' arguments are not evidence") did not solve the problem. *Id.* at 856. And, although the evidence of the defendant's guilt was quite strong, "the tenor of the prosecution severely prejudiced the defendant." *Id.* The court concluded that the "improper comments have prejudicially affected Conrad's substantial rights and worked to deprive him of a fair trial." *Id.* at 857.

### 1. Relation to the Charged Offense and Prejudicial Effect

In Black's case, the Conspiracy Count was based upon a theory that Black and certain co-defendants conspired amongst themselves to violate 18 U.S.C.

§ 922(g)(1).  They conspired, in other words, to be felons in possession of firearms.

To prove this conspiracy, the Government was required to prove **two elements**: an agreement and at least one overt act in furtherance of the conspiracy. 18 U.S.C. § 371.  The overt acts it alleged as to Black were the three unrelated instances of gun possession discussed *supra*, at Facts, Part II.B.  (Aplt. App'x 38-39, ¶¶ 12, 17, 20.)  The Government sought to prove agreement by pointing to gang affiliation.  Gang affiliation is one thing—but the facts and circumstances surrounding a claimed ongoing gang war with six murders and numerous shootings are quite another.

Minutes into its opening statement, the Government began talking about individuals other than Black, other alleged conspirators, and the gangs with which they were affiliated.  It pivoted to a discussion of a five-year "gang war," but did not stop there, instead presenting a demonstrative setting forth six murders and seven additional shootings and referring to those events in stark terms—men being "shot to death" sometimes in "ambush" situations.  (Aplt. App'x 54-61.)  The Government was allowed to proceed with this presentation, despite the fact that by its own admission, "we don't have to prove to you why they possessed the guns." The highly prejudicial and irrelevant information was offered allegedly only as "background" and "context."  (Aplt. App'x 54.)   Moreover, not a single witness

(lay or law enforcement) testified that Black had anything at all to do with any of the violence.  In fact, for many of the events, Black himself was incarcerated.

The highly prejudicial nature of this evidence of violence is beyond question.  The evidence also was entirely unnecessary to the Government's case and unrelated to any element of any charged offense.  As such, the evidence was of no additional value to the jury, and part one of the test set forth in *Conrad* weighs in favor of Black.  *Conrad*, 320 F.3d at 855.

## 2.    Cumulative Effect

Just as in *Conrad*, references to the murders and shootings did not stop after the conclusion of opening statements.  The jury heard testimony related to the same from the following witnesses:  **Bridget Turntine** (Aplt. App'x 67-68("Q.  … Are you familiar with one or more other murders that occurred prior to [Tyrone Washington's murder]?  . . .  A.  Yeah I know of it.  Q.  Right.  Who was Derrick Martin?  A.  He is a part of Taliban. . . . Q.  Did he get killed some place?  A.  Yeah.  Q.  Where?  A.  At the lake."); *see also id.* At 63-64); **Antonio Lewis** (Aplt. App'x 121-23 ("Q.  And is that the only member of your gang that got killed or were there others?  A.  I got other dead friends, yeah.  . . . Q.  I want you to give the jury a sense for how intense this gang war was in the time that you were out in 2011, 2012, and early 2013."); *see also id.* at 129-30); **Kibbie Walker** (Aplt. App'x 133-37 ("Q.  I want to ask you about some incidents that have occurred

during this gang war you talked about. . . . Are you familiar with the murder of

Haywood Eaton?  A.  Yeah. . .  Q.  And he was killed in September of 2009.  Do

you know the circumstances?  A.  You mean why he was killed?  Q.  Yes.  Or

where was he killed?  A.  On Broadway. . . . At Burger King. . . .  Q.  And are you

familiar with a person named Decari Starr, also known as Pudda Loc?  A.  Yes.

Q.  He got killed about seven or eight months later in May of 2010?  A.  Yeah.  . . .

Q.  What happened to [Derrick Martin] that night of May 24th, 2010?  A.  He got

killed.  Q.  Were you in the area?  A.  Yeah.  Q.  Did you hear the shots?  A.  Yeah.

Q.  Was it dark?  A.  Yeah.  Q.  Was it more or less an ambush?  A.  Yeah.”); *see

also* Aplt. App’x 130-31, 137-45); **Julie Gartrell** (Aplt. App’x 147-50 (“So we’ve

heard testimony that [Tyrone Washington] was killed the early morning hours of

November 3rd at the Epic nightclub downtown at about 1:00 a.m.  And what I

want to ask you about is whether something happened at your house . . . at about

4:30, quarter to 5:00 that morning?  . . .  A.  The front windows of my house was

shot out. . . .  Q.  Had your house ever been shot up before?  A.  Yes . . . a few

years prior.”));  **Terrence Olson** (Aplt. App’x 158-61 (“Q.  And what happened in

the early morning hours of November 1, 2014 with respect to Jabari Johnson?

A.  At about 3:41 a.m. officers were dispatched to Denny’s Restaurant . . . to

investigate a shooting.  They discovered that victims had been in a vehicle, five of

them total, and that the assailant had approached on foot, fired into the vehicle, and

fled on foot. . . . Q.  And was Mr. Jabari Johnson hit?  A.  Yes, he was . . . . About five times.  Q.  And was there another person in the vehicle that was hit by the gunfire?  A.  There was, yes. . . . Marchello Blount. . . . [h]e was shot in the head and he sustained a brain injury and the loss of an eye. . . . Q.  Had something happened at the same location, was it a week before?  A.  That's right.  A week previous, a YNT gang member was shot at the same restaurant.")); **Kathryn Singer** (Aplt. App'x  191("Q.  And we notice that [Jabari Johnson's] hand is bandaged?  A.  Correct.  Q.  Had he been involved in a shooting just November – A.  1st. . . . Q.  So he was still bandaged up, in his hand at least?  A.  Yes.")); **David Voth** (Tr. Aplt. App'x 274-75 ("Q.  We heard this morning about Jabari Johnson getting shot and wounded on November 1 of 2014?  A.  Yes, sir. . . . There was shootings going on all along."); *see also id.* at 272-73); **Michael Meath** (Aplt. App'x 327-29 ("911 call came in from a Ms. Black and said that her – she believed that her house may have been shot by gunfire."); as well as multiple references during the **Government's closing argument** (Aplt. App'x 333-34 ("And why?  Why did they have to do this?  Well, Tyrone Washington had just been killed, what is it, 40 days earlier.  And you know what happens when somebody gets killed.  We saw it over and over and over again in this whole sad litany of people getting killed. . . . [i]t starts with a Taliban guy back in '09 getting killed by a 1-9 guy named Christopher Batuoh.  . . . And you can see it's just tit for

tat all the way down over the years.  Next time a 1-9 guy kills Haywood Eaton . . . .

Another one of the 1-9 members Pudda Loc gets killed.  And then there's

retaliation.  A Taliban guy gets killed over at Lake Calhoun.")).

The Government may argue that evidence of Black's guilt was strong and

that all of these references to homicides and woundings did not matter.  The court

rejected a similar argument in *Conrad*, and it should reject it here as well.  The

"tenor of the prosecution," dwelling as it did on the substance of the gang war,

"severely prejudiced" Black to a much greater degree even than Mr. Conrad,

whose conviction the court reversed.  *Conrad*, 320 F.3d at 855-56.  The

"cumulative effect" prong of the *Conrad* test weighs in favor of reversal.

### B.     Officer Tuma's Testimony Compounded the Unfairness.

Officer Tuma testified on the fourth day of trial.  As noted above, she did not

have any first-hand experience with the offenses charged in this case and rather

was assigned to an "intel" position, gathering information from the Internet and

police reports, and compiling dossiers on city-wide supposed gang members.  In

response to Black's supplemental motion *in limine* detailing the expected problems

with Officer Tuma's testimony in detail and seeking to exclude that testimony

(Dkt. No. 518), the district court denied the motion but ruled before trial that Tuma

was not permitted to offer her opinion as to Black's membership in any particular

gang.  She was permitted to testify only as to the nine criteria for gang membership under Minnesota law.

Officer Tuma testified that Black met the majority of these criteria, based upon the hearsay (and double hearsay) evidence she reviewed in others' police reports and online.  She admitted that she was not present for any part of law enforcement's involvement in the overt acts or instances of possession charged in the Indictment, she did not speak with any of the officers whose reports she reviewed in preparation for her testimony, and she did not speak to any individual officers (including from probation) regarding Black before writing her report concerning him.  (Aplt. App'x 239-42.)

During her testimony, Tuma dwelled to some degree on murders and shootings but addressed herself mostly to gang "intel."  She often did so emotionally, becoming combative when defense counsel asked her whether certain terms had multiple meanings depending upon context (Aplt. App'x 248) and whether she would agree that she was not part of the culture in North Minneapolis  (Aplt. App'x 249-50).  She also defined certain terms in a manner derogatory to the residents of that community during her testimony.  (Aplt. App'x 223.)

Gang-related evidence is inadmissible if its purpose is solely "to prejudice the defendant or prove his guilt by association with unsavory characters."  *United*

*States v. McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005). Officer Tuma's testimony, and the manner in which it was delivered, did not prove any element of the conspiracy charge and had the effect instead of "deflect[ing] the jury's attention from the immediate charges and caus[ing] it to prejudge [Black], thereby denying [him] a fair opportunity to defend against the offense that is charged." *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991). Officer Tuma's testimony permitted the Government to continue down its path of proving Black's guilt by association and through appeals to the jury's fear of street violence and gangs, none of it charged in the Indictment. Coupled with repeated references to uncharged murders and shootings, the effect was that Black did not receive the fair trial to which he was entitled.

**C. Other Facts Operated To Make a Fair Trial an Impossibility.**

The repeated references to murders and shootings discussed above provides sufficient basis for this Court to conclude that Black was denied a fair trial. This reality is further compounded by the testimony of Officer Tuma. The additional facts set forth below only further compel the determination that Black did not receive the fair trial to which he was entitled.

- The Government was allowed, over Black's objections, (Dkt. No. 473), to present a ballistics expert who, although careful not to use the word "match," testified to this effect, citing "a scientific

method that has been used for 50 to 90 years," (Aplt. App'x 151) as well as undisclosed "research projects" (Aplt. App'x 152-54) in relation to found casings that corresponded to firearms that had absolutely nothing to do with Black. This testimony circumvented the district court's earlier ruling that a firearm examiner was prohibited from testifying as to any "certainty," "practical impossibility," or true "match." (Aplt. Add. 10; *see also id.* at 12-13 (affirming magistrate judge's determination).)

- The Government was allowed, over Black's objections (*e.g.*, Aplt. App'x 156-57, 164-65), to present photos and images taken from Facebook and Instagram that showed Black in the company of supposed gang members or depicted what the Government deemed gang-related material. None of the photos were authenticated by a Facebook or Instagram records custodian. Many of them bore no indicia even as to when they were captured or printed and the Government presented no evidence as to who had access to the social media accounts or who actually posted the photos and images.

This Court's duty is to decide where prosecutorial statements and the admission of evidence in a trial simply has gone too far. Black did not receive a fair trial, because from the moment the jury sat down, it was inundated with details

of a violent gang war, and of murders and shootings that did not implicate Black in any way, nor otherwise connect him to any of those crimes or to the offenses charged. By the Government's own admission, this information was unnecessary to the proof of any element of the offenses. The jury further experienced the theatrics and hearsay testimony of Officer Tuma, the cumulative effects of supposed ballistics "matches," and the unauthenticated social media postings. Viewing this in context, Black was denied due process and a fair trial and this Court should reverse his convictions.

## II. The Evidence at Trial Was Insufficient to Support Black's Conviction on the Possession Count.

The Eighth Circuit reviews challenges to sufficiency of the evidence to sustain a conviction *de novo*, construing the evidence in the light most favorable to the verdict and accepting as established all reasonable inferences supporting the verdict. *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002). A verdict will be upheld only if there is substantial evidence to support it, but will be reversed if a reasonable jury could not have found the defendant guilty beyond a reasonable doubt. *Id.* "While reasonable inferences from the evidence weigh against the defendant, speculation does not." *United States v. Pace*, 922 F.2d 451, 453 (8th Cir. 1990). Under even this exacting standard, the Government failed to present sufficient evidence to convict Black of unlawful possession of a firearm beyond a reasonable doubt.

**A.    No Reasonable Interpretation of the Evidence Presented at Trial Supports a Conviction Beyond a Reasonable Doubt.**

To convict on the Possession Count, the Government was required to prove beyond a reasonable doubt that Black knowingly possessed a .40 caliber Smith & Wesson pistol on April 22, 2014.  *United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014).[8]  The irrelevant and unduly prejudicial evidence of murders, shootings, and a violent gang war had absolutely no bearing on any element of this offense and what little evidence the Government did present did not meet its burden to prove all of the essential elements of the Possession Count beyond a reasonable doubt.  No reasonable juror could have found that Black actually or constructively possessed the firearm based upon the relevant evidence presented.

Knowing possession of a firearm may be either actual or constructive, but even constructive possession requires a showing that "the defendant has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself."  *Id*.  Although the Government can show constructive possession through circumstantial evidence, it must show a "sufficient nexus between the defendant and the firearm."  *Id.* (quoting *United States v. Evans*, 431 F.3d 342, 345 (8th Cir. 2005)).  Circumstantial evidence of possession often includes:  prior use or ownership of the firearm, location of the firearm, and

---

8    Black stipulated at trial that he was a convicted felon and that the gun had traveled through interstate commerce.  (Aplt. App'x 183-84, 271-72.)

deceitful behavior during questioning.  *United States v. Battle*, 774 F.3d 504, 515 (8th Cir. 2014).  "Mere presence is not sufficient to support a conviction for possession."  *United States v. Dunlap*, 28 F.3d 823, 826 (8th Cir. 1994).  As discussed in more detail below, no Eighth Circuit case has upheld a gun possession conviction based upon facts as attenuated as those present here.

### 1.    Actual Possession

There was no evidence presented at trial suggesting that Black was in actual possession of the Smith & Wesson recovered along the path that the car driven by Rush had traveled.  In fact, Detective Suerth, one of the officers involved in the execution of the arrest warrant, testified under oath in an earlier federal trial that Black did **not** possess the gun at issue.  Detective Suerth reaffirmed this testimony at trial in this matter—confirming that the state county attorney's office did not charge Black with any crime based upon the chase, the dash cam video, the pole cam video, or the recovered firearm,  none of which show Black in possession (actual or constructive) of the firearm.  (Aplt. App'x 74-77.)

Moreover, no individual present at the scene saw Black throw the weapon out of the car.  Officer Johnson clarified on cross-examination that although he did see one car door open, this had occurred before the chase began and blocks away from where the firearm was found.  "At no point during th[e] chase did [Officer Johnson] see that door open again."  (Aplt. App'x 98-99.)  When asked directly

whether he saw Black throw anything out of the car, Officer Johnson's partner, Hjelm, answered on a number of occasions, "no." (Aplt. App'x 84.) In his own words, Officer Hjelm had only "a speculation" as to how the gun came to be located where it was—a speculation he was perfectly willing to maintain, but which was unsupported by any evidence at trial. (Aplt. App'x 84-85.)

The video footage from the chase does not help the Government's case either. This digital footage, taken from Officers Hjelm and Johnson's dashboard camera and a stationary police pole camera, were played for the jury multiple times by attorneys from both sides, and is being made available to this Court for its review as part of Apellant's Appendix. Neither video, shot contemporaneously with the chase, shows Black throwing or dropping a gun from the car.

Finally, it defies logic to conclude that Black actually possessed the Smith & Wesson on the day he was told by his lawyer that law enforcement officers were actively looking to arrest him. Black's attorney had informed him of this fact just before Black left the apartment complex. (Aplt. App'x 326.) No reasonably minded juror could infer that Black exited the apartment complex carrying a weapon that he knew to be illegal for him to possess, all the while knowing police were out actively looking for him.

### 2. Constructive Possession

#### (a) Prior Use or Ownership

As to constructive possession, not a single witness or exhibit tended to show that Black had ever owned or used the Smith & Wesson or that he had any control over it on the day in question.[9]  There was no testimony that he was seen with this gun, either that day, or at anytime beforehand.  His fingerprints and DNA were not found on the weapon.

#### (b) Location of the Firearm

The location of the firearm on the ground at the apartment complex—an area troubled enough to require the installation of a police pole camera—similarly does not prove constructive possession by Black.  Although the weapon was located in the approximate path of a vehicle chase in which he was a passenger, no witness (law enforcement or otherwise) testified that they say Black throw, drop, or otherwise discard the gun.

---

[9]    The Government has argued that even though no witness saw Black throw the gun out of the car, in deciding whether Mr. Black possessed a gun that day, "the jury was not limited to considering this one incident, but could also consider Black's motive to possess a firearm as a convicted felon, his prior history of possessing guns in vehicles, and his promise in the letter to his fellow 1-9 gang member that he would carry a gun at all times."  (Dkt. No. 582 at 6-7.)  However, "it is not enough that the defendant possessed a firearm at some unidentified point in the past; the evidence must prove that the defendant possessed the same handgun 'identified in the indictment.'"  *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007).

Moreover, there was no evidence presented at trial tending to show how long the gun had been there. Both lay witnesses who were in the area where the gun was found testified that they passed by the location at least once after the chase, yet did not see any weapon on the ground. The weapon was found at approximately 2:00 p.m., in a public place with other individuals nearby—without any testimony or video footage suggesting in any way that Black previously possessed the gun or was seen discarding the gun. Under such circumstances, a reasonable doubt exists as to how, when, and by whom the gun was deposited at its location. *Compare United States v. Light*, 406 F.3d 995, 998 (8th Cir. 2005) (finding it reasonable for the jury to disregard alternative sources for the gun because the firearm was recovered while the defendant was being arrested and the two unidentified people were not seen in the area until 30 minutes later).

### (c)    Deceitful Behavior

This situation is also devoid of any "deceitful behavior" by Black that supports an inference of guilt. Black was not driving the vehicle and had no control over the driver's decision to flee when confronted by police. Although fleeing when confronted with police has been found to be circumstantial evidence of a defendant's guilt in this circuit, in such cases the defendant's flight was of his own volition. *See*, *e.g.*, *United States v. Garrett*, 648 F.3d 618, 622-23 (8th Cir. 2011); *United States v. Varner*, 678 F.3d 653 (8th Cir. 2012); *United States v.*

*Arrington*, 215 F.3d 855, 856-57 (8th Cir. 2000); *United States v. Bailey*, 831 F.3d 1035 (8th Cir. 2016). Notably, in *Varner* and *Bailey*, even though the defendant was a passenger in the fleeing car, each individual attempted to flee by foot after a chase had ended. Black did not make such an attempt when Rush (who had his own reasons to flee the police) finally pulled the car over.

### (d)     Mere Presence

Even accepting the argument that the gun was thrown from the car, despite the lack of evidence of this occurring, the Government still must show that Black had constructive possession of the weapon while in the car. To show constructive possession, the Government must show control, ownership, or dominion over the firearm itself or the premises in which it is found. *Battle*, 774 F.3d at 511. Indeed, the Eighth Circuit has "specifically stated that mere presence as a passenger in a car from which the police recover contraband or weapons does not establish possession." *United States v. Johnson*, 18 F.3d 641, 647 (8th Cir. 1994) (citing *Flenoid*, 718 F.2d 867, 868 (8th Cir. 1873)).

Neither the car nor the gun was registered to Black, and the evidence at trial in fact tended to disprove possession, as neither his fingerprints nor his DNA was recovered. *Compare Evans*, 431 F.3d at 345 (finding sufficient evidence because defendant had dominion over the interior of the car and nexus to the gun). In *Evans*, the court noted that, even though the car in which the firearm was found

was registered to the defendant's girlfriend, the defendant lived with his girlfriend and drove the car on a regular basis. *Id.* In contrast, there was no testimony in this case that Black knew about the gun or that he had ever been in the Pontiac before.

*United States v. Madkins* is instructive. 994 F.2d 540, 542 (8th Cir. 1993). In *Madkins*, the Eighth Circuit reversed and remanded a felon-in-possession conviction with instructions to enter a judgment of acquittal. *Id*. at 543. In that case, a bank security guard had become suspicious of a car parked outside the bank with two occupants. *Id.* at 540. When police arrived, the suspicious car had moved across the street to an auto parts store. *Id.* The defendant, who had a prior felony, was working under the hood of the car, and another male was with him. *Id*. Police eventually searched the car and recovered a .380 caliber semi-automatic pistol under the front seat, a pair of gloves, and a piece of nylon pantyhose with a knot tied in it, and arrested both men. *Id*. at 541. As here, no witness testified to seeing the defendant with the gun in his possession, police found no fingerprints or evidence as to who owned the gun, and no witness saw the defendant put the gun where it was eventually found. *Id*. at 542. Thus, this Court concluded that "the government's evidence of possession [wa]s so scant that the jury could only speculate as to [defendant's] guilt. The evidence is such that a reasonably minded jury *must* have a reasonable doubt as to [defendant's] knowledge or possession of the gun." *Id*. The facts in *Madkins*, based on which this Court reversed a

conviction, are far more supportive of possession than the facts presented at Black's trial. As such, this Court should reverse and remand the Possession Count with instructions to enter a judgment of acquittal.

### (e) Other Insufficient Indices of "Constructive Possession"

This Court certainly has affirmed guilty verdicts in gun possession cases where the defendant allegedly disposed of a gun while the police were pursuing him. But, importantly, in these cases there was some further nexus connecting the defendant with the weapon, a nexus that simply is not present here.

In *United States v. Thibeaux*, police arrived on the scene after a 911 call was made in which the caller reported a man pointing a gun at another man and woman. 784 F.3d 1221, 1223 (8th Cir. 2015). The police ordered the defendant, along with two other people, to put their hands in the air. *Id.* at 1224. After initially complying, the defendant, in full sight of the officer and the dash camera, put his hand in his pocket and tossed a black object along the side of the car. *Id.* Although neither the officer nor the dash camera could make out the black object that was tossed, when the officer walked around the vehicle, he found a black handgun lying on top of the snow with no snow covering it, and there were no other items on the ground. While the gun in that case was found near where one of the other occupants of the car had been standing, an officer testified that he was able to see this other person the entire time and did not see him drop anything. *Id.*

In *Bailey*, a gun again was discarded. *Bailey*, 831 F.3d at 1037-38. In that case, the defendant fled from police on foot through a residential neighborhood. *Id.* at 1037. In the beginning of the chase, the officer observed the defendant holding on to his waist band. When the defendant attempted to jump over a fence, he stumbled and fell, and then continued running, but was no longer holding his waist band. *Id.* After the defendant was eventually apprehended and placed in the backseat of the squad car, the officer was approached by one of the people who lived in the neighborhood who reported that his grandchildren had found a gun in his backyard. The officer identified the spot as the same place he had seen the defendant stumble and fall. *Id.* The officer also located a cell phone in this same spot, which the defendant later indicated was his. *Id.* Finally, while the defendant was sitting in the squad car as the officer went to investigate where the gun was found, the camera captured the defendant saying "Damn, they found that gun. F***. Damn. F***. Oh, man. Damn." *Id.*

Lastly, in *Light*, police officers pursued the defendant on foot, keeping him in one of their lines of sight at all times. 406 F.3d at 996. Both the officers and various bystanders observed the defendant dropping items as he ran. One bystander, after watching the pursuit from the window of his apartment and observing the defendant stumble and reverse direction, immediately went down to

retrieve the money the defendant had been discarding and found the gun at the place where he saw the defendant stumble. *Id.* at 997.

In all of these cases, there was testimony linking the weapon that was found to the defendant who was fleeing from police of his own volition and discarding an object, even if no one was able to testify that the item dropped or thrown was actually the gun in question. Here, however, the record is devoid of any such testimony. Black did not flee from the police. No one saw Black throw any objects, or even open his car door during the chase to allow him to discretely drop the gun. Unlike in *Bailey*, no other property belonging to Black was found near the gun and he made no statements implying the gun belonged to him. And, assuming the gun was discarded from the car, it is reasonable and just as likely that Rush was the one to discard it.[10]

In sum, Black's conviction on the Possession Count requires a series of inferential leaps that are unreasonable and unsupported by the evidence. First, the jury had to infer that the gun came from the Pontiac, despite no evidence establishing when or how the firearm arrived where it was recovered. Second, the jury had to infer that the gun came from Black, and that Black had the requisite knowledge, control, and intent to establish constructive possession. This second

---

[10] Mr. Rush's window was open at the time the car was pulled over, as shown on the squad video.

inference would have to be reached (1) despite the lack of fingerprint or DNA evidence, or evidence that Black ever touched or was seen with the recovered gun; (2) despite the lack of evidence that Black had any dominion or control over the car, which was not his, or that he had ever been in that car before; (3) despite the lack of evidence that the Pontiac's passenger door or window were opened during the pursuit, whereas Mr. Rush's window clearly *was* open; and (4) despite the unreasonableness of assuming that Black would bring a loaded gun with him into a car after being told moments before by his lawyer that a bench warrant had been issued for his arrest and the police were actively looking for him. This series of leaps is unsupported and unreasonable.

The Government's proof on the Possession Count does not rise to the level necessary to support a verdict of guilt beyond a reasonable doubt. The evidence is insufficient and even under its exacting standard of review, this Court should reverse.

### III. The Evidence Was Similarly Insufficient for the Jury To Convict Black of Conspiracy.

No witness testified at trial that Black agreed with any gang member to jointly possess firearms. Black took the stand and, after admitting to the instances in which he did possess a gun and explaining to the jury why he did so, stated that he did not agree with any other individual to possess said weapons. (Aplt. App'x 314, 319-20, 322, 324-25.) As he candidly testified at trial and reiterated to the

district court before sentencing, he simply did not share guns. He kept them, illegally, to protect himself, yes; but he agreed with no one as to their possession or use.

Witness testimony aside, which the jury certainly could discount as it deemed appropriate, the unauthenticated social media postings that the Government used to bolster the concept of affiliation and agreement also failed to establish any conspiracy or agreement. At the very most, they depicted Black in the "mere presence" of individuals that the Minneapolis Police Department had at some point determined to be gang members. Black was convicted of conspiracy for wearing t-shirts memorializing his dead brother—and not much more.

Eighth Circuit case law establishes that "a defendant's mere presence . . . is insufficient to establish membership in a conspiracy." *United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007). Here, the Government charged a conspiracy to unlawfully possess firearms, but it showed the jury merely (1) Black in the presence of firearms; and (2) Black in the presence of alleged gang members.

In light of the prejudicial and irrelevant evidence presented at trial, it is perhaps not surprising that the jury convicted Black of conspiracy despite this dearth of evidence. (*See supra*, Part I.) But it is no less in error. The Court should reverse Black's conviction on the Conspiracy Count as well.

**IV.    The Case Agent Presented False Testimony to the Grand Jury that Substantially Influenced the Grand Jury's Decision To Indict on the Possession Count and the District Court Erred in Failing To Dismiss as a Result of that False Testimony.**

Dismissal of the Indictment is appropriate when the Grand Jury is presented false information, "'if it is established that the violation substantially influenced the Grand Jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).  This Court reviews the denial of a motion to dismiss for abuse of discretion.  *United States v. Rodriguez*, 414 F.3d 837, 842 (8th Cir. 2005).

Given the state of the evidence, it is questionable why the Grand Jury indicted Black on the Possession Count in the first place.  This question goes back to the Grand Jury testimony of the Case Agent—who falsely testified that "[t]he passenger of the car, which was Veltrez Black, during the chase opened a passenger door just a little bit and threw something out," (Aplt. App'x 279), and that the spot where he opened his door was where the gun was later recovered. (Aplt. App'x 282.)  When he testified at trial, the Case Agent admitted that the only evidence of a door opening occurred before the chase began, not during the chase, and not in the spot where the gun was later recovered.  The Case Agent's testimony to the Grand Jury was false and was the only evidence that could properly have influenced the Grand Jury's decision to indict Black on the

Possession Count.  It bears repeating that Detective Suerth and the State prosecutor, who were aware of the actual facts, concluded that there was insufficient evidence to arrest or charge Black.  (*See supra*, Facts, Part II.C.)

The Case Agent's false testimony was not even limited to the Possession Count.  He also testified that Veltrez Black was "the current leader" of the 1-9 gang (a notion dispelled when the Government agreed to redact that language from the Superseding Indictment prior to trial) and that the house on Girard Avenue North was Black's "residence" (proven false by the testimony of the home's renter, Bridget Turntine, at trial).  (*Compare* Aplt. App'x 16-18 *with id.* at 50 *and id.* at 69.)

The district court erred when it denied Black's motion to dismiss.  Dismissal was appropriate because the Case Agent's false testimony was the sole basis for the Grand Jury to return an Indictment on the Possession Count, and because Black suffered actual prejudice as a result of this false testimony.  *See United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987).  And although as a general rule a "petit jury's guilty verdict render[s] [any] errors harmless," *id.*, here (and as set out in detail above) the cumulative effect of highly prejudicial, inflammatory, and irrelevant evidence of murders, shootings, and woundings cast a serious doubt as to the legitimacy of the petit jury's verdict.

**V.     Black's Sentence of 180 Months is Disproportional and Greater than Necessary To Achieve the Aims of 18 U.S.C. § 3553(a).**

The district court sentenced Black to 180 months imprisonment and, in doing so, failed to adequately consider the unwarranted disparity that this sentence created among similarly situated co-defendants.  Accordingly, should this Court affirm the Possession Count conviction, it should vacate Black's sentence and remand the matter for resentencing.

This Court reviews a sentence imposed for abuse of discretion.  In applying this standard, this Court's duty is to "ensure that the district court committed no significant procedural error," such as failing adequately to consider the section 3553(a) factors, as well as to determine whether the sentence imposed was substantively reasonable.  *Gall v. United States*, 552 U.S. 38, 51 (2007).

**A.     The District Court Committed Procedural Error in Sentencing Black to 180 Months in Prison.**

To impose a sentence free from procedural error, a district court must consider and take into account the factors set forth in the federal sentencing statute, 18 U.S.C. § 3553(a).  These factors are familiar, and their aim is clear:  to encourage district courts to impose a sentence that is sufficient, but not greater than necessary, to achieve the aims of the criminal justice system.  *See* 18 U.S.C. § 3553(a).  The factors include "**the need to avoid unwarranted sentence disparities**" *Id.* § 3553(a)(6) (emphasis added).  The district court committed

procedural error because—although it made reference to the section 3553(a) factors—it did not adequately consider the need to avoid unwarranted sentence disparities among similarly situated defendants.

This Court has considered sentencing disparity in the context of co-conspirators before and has held that disparities in sentencing "generally are not unwarranted where one defendant cooperates and one does not, or where one defendant plays a greater role in the conspiracy than the other." *United States v. Crumley*, 528 F.3d 1053, 1068 (8th Cir. 2008). In *United States v. Shepard*, it emphasized the fact that co-conspirators may be sentenced disparately when they are not similarly situated. 413 F. App'x 931, 932 (8th Cir. 2011) (unpublished) (finding that sentences of 110 months and 275 months were warranted, given that the defendant receiving the lesser sentence had a criminal history category of I, while the appellant had a criminal history category of VI). But for all of the instances in which this Court has determined that a disparity among co-conspirators is warranted, it also has expressed concern over "extreme disparity in the sentences imposed on two remarkably similar participants in the same criminal conspiracy." *United States v. Lazenby*, 439 F.3d 928, 932 (8th Cir. 2006).

In *Lazenby*, the court considered the sentences of two women who pleaded guilty to identical methamphetamine offenses. One defendant received a year-and-a-day sentence, which constituted a substantial downward variance; the other

received 87 months in prison.  *Id.* at 929.  After examining the offense conduct of both defendants, as well as the sentencing proceedings to which each was subject, the court reversed both sentences and remanded to the district court for resentencing of both women.  *Id.* at 934.  The court concluded its analysis as follows:

> Finally, and perhaps most importantly, the district court gave too little weight to the extreme disparity between the sentences imposed on two similarly situated conspirators . . . .  Perfect parity among the sentences imposed on various members of a criminal conspiracy is no doubt impossible to achieve . . . [b]ut the extreme disparity in these two sentences not only fails to serve the legislative intent reflected in § 3553(a)(6), it also suggests an arbitrary level of decision-making that fails to "promote respect for the law, § 3553(a)(2)(A)."

*Id.*  Perfect parity may indeed be nearly impossible to achieve.  But unlike the co-conspirators in *Crumley* and *Shepherd*, Black is in fact similarly situated with his co-defendants.

Setting aside the straw purchasers,[11] the other eight individuals indicted were convicted of the same offense and had markedly similar criminal histories, as indicated in the chart below.

---

[11]  Defendants Deontay Jones and Lakesha Coleman were the "straw purchasers" charged in this matter—individuals who pleaded guilty to purchasing firearms for use by other individuals who were unable to purchase the guns themselves due to prior felony convictions.

| Defendant | Charge of Conviction & Term of Imprisonment | Criminal History |
|---|---|---|
| Dontevius Catchings | Count 1; 60 mos. | IV |
| Cinque Owens | Count 1; 46 mos. | IV |
| Marques Armstrong | Count 1; 57 mos. | IV |
| Marquis Woods | Count 7; 84 mos. | IV |
| Darryl Parker | Count 1; 60 mos. Count 6; 78 mos. [concurrent] | VI |
| Nitelen Jackson | Count 1; 52 mos. | VI |
| Jabari Johnson | Count 1; 60 mos. Count 5; 78 mos. [concurrent] | VI |
| Tywin Bender | Count 1; 60 mos. | IV |

All except one of the above-named defendants had prior felony-level convictions in state court. Each individual confirmed at his respective change-of-plea hearing that he was a member of either the 1-9 or the SUB gang, and one of them (unlike Black) received added points for having a leadership role. None of them agreed to cooperate with the Government. None of them testified for the Government at Black's trial. And although the Government may argue that Black was sentenced for a larger number of guns than were some of his co-defendants,

the fact that all men pleaded guilty to or were convicted of the same conspiracy involving the very same gangs (who, according to the Government, shared the very same guns) belies this conclusion.

Black was assigned a criminal history category of VI, the same as Darryl Parker, Nitelen Jackson, and Jabari Johnson. Black was not a leader in the charged conspiracy; he did not perpetrate either of the crimes of which he was convicted any differently or worse than his co-defendants. In fact, he was convicted of mere possession of a firearm, while others' possession charges stemmed from violent and premeditated armed robberies. (*See, e.g.*, Aplt. App'x 20-27 (referring to Marques Armstrong and Dontevius Catchings being arrested for armed robbery, the circumstances underlying ¶ 14 of the Superseding Indictment); *id.* at 28-33 (referring to Tywin Bender's unlawful possession of a firearm during an armed robbery, the circumstances underlying ¶ 10 of the Superseding Indictment).) He certainly did not engage in witness tampering in connection with his trial, as his co-defendant Tywin Bender did. Yet, even Mr. Bender received sentences cumulatively 50 months lower than Black.

The only way in which his co-defendants were "better" in the eyes of the Government and perhaps the district court was in their willingness to plead guilty. Black should not be punished so severely for exercising his right to a jury trial. The fact that he was not eligible for the three-level reduction for acceptance of

responsibility that his co-defendants received should not equate to a sentence in many instances **three times** the length of theirs.

Black has argued that a sentence of 77 to 100 months was appropriate based, in part, on the sentence disparity set forth above. At sentencing, the district court spoke of the section 3553(a) factors, but in terms of disparity, stated only that it was "imposing a sentence to avoid what are known as unwarranted sentencing disparities." (Aplt. App'x 355-56.) It did not explain for the benefit of Black or of this Court on appeal why it considered a sentence of 180 months appropriate, when other defendants charged with the same conspiracy received markedly lower sentences. The Government, for its part, told the district court that (at the time of Black's sentencing), the "more serious ones" were yet to be sentenced, referring specifically to Tywin Bender and Nitelen Jackson as being "off the charts" and as having "higher guideline ranges." (Aplt. App'x 357.) Yet, when it came time to sentence the "more serious ones," they did not receive higher sentences than Black. In fact, they received much lower. Mr. Jackson was sentenced to 52 months consecutive to a state-court term of confinement (Dkt. No. 752) ; Jabari Johnson got 78 months (to be served concurrently with 60 months on the conspiracy charge) (Dkt. No. 780); and Mr. Bender received 60 months (in addition to 70 months on the witness tampering charge) for a total of 130 months. (Dkt. No. 792; D. Minn. Case No. 15-cr-29, Dkt. No. 89.).

Black's 180-month consecutive prison sentence is greater than necessary to achieve the aims of the criminal justice system, as illustrated by the fact that it is more than triple or double that of most of his co-defendants. Should the Court affirm the Possession Count conviction, it should vacate and remand for resentencing.

## CONCLUSION

For the reasons set forth above, and based upon the entire record in this matter, Black respectfully submits that the judgment entered by the district court should be reversed. In addition, Black requests that his conviction on both counts be reversed for insufficient evidence and remanded for entry of judgments of acquittal. As a final alternative, Black requests that this Court vacate his sentence and remand his case to the district court for resentencing not inconsistent with the Court's opinion.

Dated: November 4, 2016                    DORSEY & WHITNEY LLP

                                           By s/ RJ Zayed_____
                                                 RJ Zayed (#0309849)
                                           50 South Sixth Street, Suite 1500
                                           Minneapolis, MN 55402-1498
                                           Telephone: (612) 340-2600

JONES DAY
Kristin K. Zinsmaster (#0391299)
90 South Seventh Street, Suite 5090
Minneapolis, MN 55402
Telephone:  (612) 607-7950

*ATTORNEYS FOR APPELLANT*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Appellant certifies that this brief complies with the requirements of Fed R. App. P. 32(a)(7)(B) in that it is printed in a 14-point, proportionately spaced typeface utilizing Microsoft Word 2010, and contains 12,051 words, excluding the Summary of the Case, Table of Contents, Table of Authorities, and the certificates.  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2010) used to prepare this brief.

Dated:  November 4, 2016.


s/ RJ Zayed
RJ Zayed

## CERTIFICATE OF VIRUS PROTECTION

Pursuant to 8th Cir. R. 28A(d)(2), the undersigned hereby certifies that the

PDF version of the Brief of Appellant has been scanned for viruses and that no

virus has been detected.

Dated:  November 4, 2016

s/ RJ Zayed
RJ Zayed

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: November 4, 2016


s/ RJ Zayed
RJ Zayed